# In the United States Court of Federal Claims

No. 15-1041C
(Filed: February 18, 2016)*
**\*Opinion originally filed under seal on February 10, 2016**

| | |
|---|---|
| MACAULAY-BROWN, INC., | )<br>)<br>) |
| Plaintiff, | )<br>)<br>) |
| and | )<br>)<br>) |
| CACI-WGI, INC.,<br>BOOZ ALLEN HAMILTON, INC., | )<br>)<br>)   Bid Protest; Motion for Judgment on<br>)   the Administrative Record; Corrective<br>)   Action |
| Plaintiff-Intervenors, | )<br>)<br>) |
| v. | )<br>)<br>) |
| THE UNITED STATES, | )<br>)<br>) |
| Defendant, | )<br>)<br>) |
| and | )<br>)<br>) |
| JACOBS TECHNOLOGY, INC., | )<br>)<br>) |
| Defendant-Intervenor. | )<br>)<br>) |

*Kevin P. Connelly*, Washington, DC, for plaintiff.  *Kelly E. Buroker* and *Caroline A. Keller*, Washington, DC, of counsel.

*Thomas O. Mason*, Washington, DC, for plaintiff-intervenor CACI-WGI, Inc. *Christopher J. Kimball*, Washington, DC, of counsel.

*Jonathan D. Shaffer*, Tysons Corner, VA, for plaintiff-intervenor Booz Allen Hamilton, Inc.  *Mary Pat Buckenmeyer*, Tysons Corner, VA, of counsel.

*Mariana T. Acevedo*, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, with whom were *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General, *Robert E. Kirschman, Jr.*, Director, and *Claudia Burke*, Assistant Director, for defendant.  *Craig S. McCaa*, Special Operations Judge

Advocate's Office, Acquisition Law, United States Special Operations Command, and *Marvin K. Gibbs*, Commercial Law and Litigation Directorate, Air Force Legal Operations Agency, of counsel.

*Robert J. Symon*, Washington, DC, for defendant-intervenor Jacobs Technology, Inc. *Elizabeth A. Ferrell* and *Aron C. Beezley*, Washington, DC, of counsel.

**O P I N I O N**

**FIRESTONE**, *Senior Judge*.

Pending before the court in this bid protest challenging proposed corrective action are cross-motions for judgment on the administrative record filed by plaintiff MacAulay-Brown, Inc. ("MacAulay-Brown"), plaintiff-intervenors CACI-WGI, Inc. ("CACI") and Booz Allen Hamilton, Inc. ("Booz Allen"), defendant the United States ("the government"), and defendant-intervenor Jacobs Technology, Inc. ("Jacobs"). The plaintiffs were awarded contracts by the United States Special Operations Command ("SOCOM" or "the agency"). In response to protests before the U.S. Government Accountability Office ("the GAO"), the agency proposes to take corrective action to amend the solicitation, establish new dates for the submission of proposals, and make new award decisions. The plaintiffs claim that the proposed corrective action is arbitrary and capricious. The government and Jacobs argue that the planned corrective action is within the scope of the government's discretion and must be upheld.

Under the request for proposals, Solicitation No. H92222-14-R-0020 ("the RFP" or "the solicitation"), SOCOM awarded indefinite delivery, indefinite quantity ("IDIQ") contracts totaling up to $900 million for global support services to MacAulay-Brown, CACI, Booz Allen, and non-party Raytheon Blackbird Technologies, Inc. ("Raytheon Blackbird"). The awards were based in significant part on the agency's evaluation of

offerors' proposals for three initially awardable task orders, identified here as "task order one," "task order two," and "task order three." The agency awarded task orders one and two to Booz Allen and task order three to MacAulay-Brown.

Following the four IDIQ awards and the three initial task order awards, several disappointed bidders filed protests with the GAO. The GAO protesters claimed, among other things, that the procurement process was flawed because Raytheon Blackbird had an actual or potential organizational conflict of interest ("OCI")[1] with regard to task order one that was not properly evaluated by the agency and that should have made Raytheon Blackbird ineligible for an IDIQ contract even though Raytheon Blackbird was not awarded the task order.

---

[1] As defined in the Federal Acquisition Regulation ("FAR"), OCI "means that because of other activities or relationships with other persons, a person is unable or potentially unable to render impartial assistance or advice to the Government, or the person's objectivity in performing the contract work is or might be otherwise impaired, or a person has an unfair competitive advantage." FAR § 2.101. OCI exists when work performed by a contractor may result in (1) an unfair competitive advantage because the contractor may be setting the ground rules for future contracts that would benefit its affiliates, or (2) impair the contractor's objectivity in performing government work if for example it is called upon to evaluate proposals submitted by affiliates, or (3) where the contractor has access to nonpublic information that it could provide to an affiliate. When OCI exists, a contracting officer must neutralize or mitigate the OCI to ensure there is no unfair competitive advantage. This could mean eliminating an offeror from a competition or imposing a mitigation plan to protect against bias. See generally FAR §§ 9.504-06. Agencies are also authorized to waive OCI if they find it in the best interests of the government. See FAR § 9.503.

FAR subpart 9.5 "(a) [p]rescribes responsibilities, general rules, and procedures for identifying, evaluating, and resolving [OCI]; (b) [p]rovides examples to assist contracting officers in applying these rules and procedures to individual contracting situations; and (c) [i]mplements section 8141 of the 1989 Department of Defense Appropriation Act, Pub. L. 100-463, 102 Stat. 2270-47 (1988)." FAR § 9.500 (scope of subpart). Section 8141 of the 1989 Department of Defense Appropriation Act directed the Administrator of the Office of Federal Procurement Policy to issue government-wide regulations setting OCI standards and compliance procedures for persons who provide consulting services.

After reviewing the GAO protesters' arguments, SOCOM wrote to the GAO explaining that the agency had decided to take corrective action to address the concerns raised by the protesters.  The agency announced that it intends to amend the solicitation to remove task order one from the procurement, add another task order in its place, establish a new date for the submissions of proposals, and make new award decisions. Under the proposed corrective action, the agency will terminate the currently awarded IDIQ contracts and task orders.  Administrative Record ("AR") 19005a.

In this bid protest, the plaintiffs, which were awarded IDIQ contracts, challenge the agency's proposed corrective action plan.  The plaintiffs argue that the agency's corrective action proposal is not reasonable under the circumstances because there is no evidence in the administrative record to show that any of the IDIQ awardees, including Raytheon Blackbird, has actual or potential OCI under the IDIQ awards or task order awards.  In the alternative, they argue that the corrective action must be reasonably targeted to the problem identified and that unless and until the agency conducts an OCI evaluation to establish with "hard facts" the existence of an OCI issue that cannot be avoided or mitigated, the record does not support the proposed corrective action.

The government acknowledges that the agency has not evaluated any of the awardees for OCI concerns and thus does not know if there is in fact an actual or potential OCI problem.  Nonetheless, the government argues that the proposed corrective action is supported by the record because the agency claims that it failed to consider whether there were OCI issues associated with task order one.  The government explains that the agency designed the solicitation with OCI concerns in mind and evaluated the OCI plans submitted in the solicitation proposals to ensure that OCI would be considered

in awarding task orders in the future.  But, the government contends, the agency did not consider whether any offeror had unmitigatable OCI with regard to task order one.  The agency further explains that it no longer wishes to carry out task order one as part of the current solicitation due to OCI concerns.  Instead, the agency intends to move task order one to another solicitation.  In addition, the government asserts that the agency needs to make other changes to the solicitation to meet new requirements.

For the reasons discussed below, the court finds that the agency's proposed corrective action is not reasonable under the circumstances because it is based on an assumption, unsupported by the record, that the IDIQ awards and task order awards have been tainted by OCI concerns.  Accordingly, the plaintiffs' motions for judgment on the administrative record are **GRANTED**.  The government's and Jacob's cross-motions for judgment on the administrative record are **DENIED**.  The agency's decision is **VACATED** and **REMANDED** to allow the agency to evaluate whether there are any facts to support the allegations of OCI concerns, and, if so, for the agency to take appropriate corrective action to address those concerns.

## I.    BACKGROUND

### A.    The Solicitation

SOCOM is responsible for organizing, training, and equipping all United States special operations forces.  AR 591.  The procurement at issue in this case is part of a broader SOCOM Wide Mission Support ("SWMS") acquisition that will provide worldwide professional support services.  AR 548-52, 591.  The agency decided to conduct the SWMS acquisition in three groups, identified as "Group A," "Group B," and "Group C," based in part on the level of risk of actual or potential OCI.  AR 30-31, 60.

Specifically, in the SWMS acquisition plan, SOCOM stated that "OCI is of great concern to USSOCOM and was a consideration in developing this acquisition plan." AR 27. The acquisition plan goes on to explain that the agency "looked at groupings [to acquire services] based on competition goals, OCI concerns, small business goals, services taxonomies, organizational structure, and mission sets." AR 30. After considering various alternatives, the agency decided to establish the three groups, A, B, and C. AR 30. The plan states that "assignment of new task orders to the appropriate SWMS group will be determined by first examining the potential for OCI concerns (assigned to Group C)." AR 30. Task orders that carry a "significant" or "high" risk of OCI would be awarded under Group C, which would be a single IDIQ award set aside for a service-disabled veteran-owned small business. AR 30-31.[2] The acquisition plan stated that, under this strategy, the "winning Group C prime and sub-contractor team members will not be permitted to compete for future USSOCOM contracts outside of Group C during the SWMS period of performance." AR 32.[3]

This protest concerns the competition for Group A, which was a full and open competition for multiple, five-year IDIQ contract awards totaling up to $900 million to provide program management, engineering and technical services, and professional

---

[2] The agency gave, "as examples, the identified requirements in support of J8 strategic planning, requirements and programming, and the engineering and technical services early in an acquisition program pose high risk due to contractor personnel having access to non-public information." AR 31.

[3] Under FAR section 9.504, which defines contracting officer responsibilities, the contracting officer is required "[b]efore issuing a solicitation for a contract that may involve a significant potential conflict . . . [to] recommend to the head of the contracting activity a course of action for resolving the conflict (see 9.506)." Under FAR section 9.506, the contracting officer can include, if appropriate, a proposed contract clause for approval by the approving official.

services.  Id.[4]  The agency evaluated bids for the SWMS Group A IDIQ contracts based

on offerors' proposals for three representative task orders that would be awarded with the

IDIQ contracts.  Task order one was for special operations research, development, and

acquisition center support.  AR 940.  Task order two was for developing publications and

other media products for a senior military engagement program.  AR 957.  Task order

three was for geopolitical and subject matter expertise.  AR 968.

The decision to put task order one, which is the focus of this protest, in Group A

was expressly considered by the agency in its deliberations.  The agency received several

comments on the solicitation regarding the decision to include certain tasks in Group A

on the grounds that the tasks could raise OCI concerns.

Comment:

> [After identifying several tasks in the draft solicitation:] Recommend moving each of these sections to G[roup] C to better firewall and alleviate any residual OCI concerns. . . .

Agency response:

> If there is a high risk of a potential or actual OCI, the task order will be awarded under Group C.  Otherwise the mitigation will occur at the task order level for Groups A & B.

AR 330; see also AR 317 (giving the same answer to other questions raising OCI

concerns in connection with the scope of tasks under Group A).[5]

---

[4] The previous contracts for SOCOM's advisory and assistance services were the Global Battlestaff and Program Support ("GBPS") IDIQ contracts.  AR 526.  Those contracts were awarded competitively to Booz Allen, CACI, Jacobs, and Systems Research and Application Corporation on April 30, 2010.  Id.  Since the end of the GBPS ordering period on April 30, 2015, the agency has used other contract vehicles to address new requirements that could not await the award of the SWMS contracts.  AR 19002.

[5] Similarly, a comment for the SWMS Group B procurement noted that the draft solicitation "includes the task to provide support for the generation and review of acquisitions. . . . [W]e

Comment:

      The Contracting Officer has determined that potentially significant [OCI] may arise due to the nature of the work the Contractor will perform under this contract that may preclude the Contractor from being awarded future USSOCOM contracts in a related area.  [Citing FAR subpart 9.5] . . . Can the Government specify any current [or] future programs that contractors could be precluded from pursuing as a result of [their] participation [i]n this program?

Agency Response:

      No, it depends on the specific requirements and contractor.

AR 331.

Comment:

      The [draft statement of work] for Group A contains tasks that qualify as Advisory and Assistance Services (Strategic and Operational Planning, Acquisition Support and Test & Evaluation to name a few).  As a result, prime contractor holders may need to recuse themselves from participating on Tasks due to potential OCI concerns.  As this limits competition, would the Government consider moving all (A&AS) tasking to another Group C?

Agency Response:

      No.

AR 331.

      The agency issued the solicitation on December 5, 2014 and, after issuing four amendments, received seventeen proposals by the closing date of January 28, 2015. AR 17326.  The agency determined that […] of those offers were in the competitive range.  Id.  On July 28, 2015, the agency awarded IDIQ contracts based on a best-value

---

recommend it be removed from Group B and added to Group C to preclude potential OCI issues."  AR 342.  The government responded with the same answer that "[i]f there is a high risk of a potential or actual OCI, the task order will be awarded under Group C.  Otherwise the mitigation will occur at the task order level for Groups A & B."  Id.

determination to Booz Allen (Contract No. H92222-15-D-0022, AR 17428), Raytheon

Blackbird (Contract No. H92222-15-D-0023, AR 17586), MacAulay-Brown (Contract

No. H92222-15-D-0024, AR 17721), and CACI (Contract No. H92222-15-D-0025, AR

17832).  See also AR 17421 (source selection decision document).  On July 29, 2015, the

agency awarded task order three to MacAulay-Brown.  AR 18364-83.  Although the

agency had, by August 3, 2015, identified changes to task order one that required

modifications, the agency awarded that task order to Booz Allen on August 13, 2015.

AR 18514, 18546-82, 18592.  On August 14, 2015, the agency awarded task order two to

Booz Allen.  AR 18411-43.

### B.  Solicitation Provisions, Proposals, and Evaluation with Regard to OCI

The RFP contained three provisions related to OCI.  Under heading H.4,

"Organizational Conflict of Interest," the RFP stated that:

> (a) The guidelines and procedures of FAR Subpart 9.5
> Organizational and Consultant Conflicts of Interest and FAR Part 3
> Improper Business Practices and Personal Conflicts of Interest, will be used
> in identifying and resolving any issues of conflict of interest.
> (b) All contractor personnel (to include subcontractors and
> consultants) who will be personally and substantially involved in the
> performance of any task order issued under SWMS Group A which
> requires the contractor to act on behalf of, or provide advice with respect to
> any phase of a procurement shall execute and submit an
> "Employee/Contractor Non-Disclosure Agreement" form.  The Contracting
> Officer . . . will provide the appropriate nondisclosure form specific to the
> procurement.
> (c) The contractor shall be responsible for identifying and preventing
> personal conflicts of interest of their employees.  The contractor shall
> prohibit employees who have access to non-public information by reason of
> performance on a Government contract from using that information for
> personal gain.
> (d) In the event that a task order requires activity that would create
> an actual or potential conflict of interest, the contractor shall immediately
> notify the [contracting officer] of the conflict, submit a plan for mitigation,
> and not commence work until specifically notified by the [contracting

officer] to proceed; or, identify the conflict and recommend to the [contracting officer] an alternate approach to avoid the conflict.

AR 875.

Under heading H.5(e), "Protection Of Proprietary Information," each offeror agreed that if it received an award and later "discovers a potential organizational conflict of interest, a prompt and full disclosure shall be made in writing to the Contracting Officer.  This disclosure shall include a description of the actions the Contractor has taken or proposes to take, to avoid or mitigate such conflicts."  AR 875.  The government retained authority to waive this clause under H.5(f) "when it is determined to be in the best interest of the Government to do so."  Id.

Finally, under heading L2.2.1.4, "Organizational Conflict of Interest (OCI) Plan," the RFP provided:  "Due to the nature of the support required, performance under task orders could possibly create OCI if not properly monitored (Reference H.4).  Describe your plan to avoid, neutralize, and mitigate [OCI].  Describe your approach to ensuring the protection of another company's proprietary information and protection of Government information."  AR 899.[6]

The solicitation documents for the three initially awardable task orders refer to OCI concerns in terms of performance objectives.  The documents explain that the agency would assess a contractor's performance based on quality of work, adherence to the planned schedule, and task order management.  AR 948, 962-63, 973-74.  Under the

---

[6] The solicitation also permitted the agency to waive the requirement that IDIQ awardees submit a proposal for every task order, for example if the task order raises unmitigatable OCI concerns. AR 874.

category of task order management, the agency provided that the awardee would need to "ensure[] OCI compliance at the task order level." Id. The "performance threshold" for this objective is that the "[c]ontractor has zero instances of OCI violations during the period of performance." Id.

The awardees' OCI plans were broadly written to cover a variety of possible task orders, including the three initially awardable task orders. MacAulay-Brown and CACI stated that their proposals did not raise any OCI problems. MacAulay-Brown stated that "every member of the MacB team has performed an OCI evaluation of their recent and existing contract base, as well as proposals in evaluation and new contracts under pursuit. Each team member has attested to the fact that no discernible or perceived OCI situation exists as of this proposal submission." AR 15914. CACI stated in its OCI plan that "CACI-WGI, Inc. warrants that, to the best of our knowledge and belief, neither we nor any of our proposed subcontractors have any past, present, or planned interest that would create or give the appearance of creating OCI, as defined in Part 9.501 of the FAR, on the SWMS-A Program." AR 13635.

Raytheon Blackbird's OCI plan states expressly that Raytheon Blackbird considered possible OCI issues related to the three initial task orders. AR 16196-16200. In particular, Raytheon Blackbird provided an OCI mitigation approach for task order one which acknowledged that:

> […]

AR 16199-16200. Booz Allen's OCI plan applies expressly to the three initially awardable task orders. AR 13178-84. In the introduction to its OCI plan, Booz Allen explained that:

Based on our current work with USSOCOM, we understand that the potential exists for OCI issues on SWMS-A (e.g., provision of acquisition program management support, engineering, and technical services pursuant to [task order one]).  To protect the Government's interest in receiving unbiased and objective advice, information, and counsel, the Booz Allen Team, including subcontractors, adheres to the comprehensive OCI Plan (or "Plan").  This Plan executes Booz Allen's overall corporate OCI policy and procedures based on [FAR] Subpart 9.5 and FAR Part 3 [Improper Business Practices and Personal Conflicts of Interest] (H.4 (a)).  As prime, Booz Allen proactively implements all necessary safeguards to ensure there is no inappropriate flow of information or instance of biased or nonobjective judgment in any of the work performed by our Team at either the IDIQ or [task order] level.  As identified in our [task order management process], we will assess the need to create a specific [task order] OCI Plan based on our overall OCI Plan (H.4 (d)).

AR 13178.[7]

The administrative record reflects that the technical evaluation team members found the OCI plans for the awardees "acceptable."  See individual technical evaluations for MacAulay-Brown, AR 17221, 17226, 17232, 17238; Booz Allen, AR 17063, 17068, 17074, 17079; CACI, AR 17087, 17092, 17098, 17103; Raytheon Blackbird, AR 17244, 17249, 17255, 17260.  Although none of the awardees' OCI plans is discussed in the source selection decision document, AR 17418-23, the record reflects that the source selection evaluation board was aware of the risk of OCI under task order one and noted in the board's final report that, for one offeror:

[…]

AR 17384.

---

[7] Lockheed Martin, which did not receive an IDIQ award, also identified possible OCI issues related to the initial task orders.  AR 15274-79 ("For the specific [task orders] included in the SWMS offer, LM has identified potential for conflict within performance of [task order one].").

## C.   GAO Protests

In August 2015, three disappointed bidders submitted protests to the GAO: ACADEMI Training Center, LLC (protest B-411947.1 and supplemental protest B-411947.3); Jacobs (B-411947.2); and Fulcrum IT Services, LLC (B-411947.4).  The GAO protesters alleged, with regard to OCI, that the agency failed to properly consider Raytheon Blackbird's potential OCI issues.[8]  Jacobs, the defendant-intervenor in this case, claimed that the agency's evaluation of Raytheon Blackbird's OCI was unreasonable and that Raytheon Blackbird should have been found ineligible for award. AR 18663.  Jacobs argued that Raytheon Blackbird, "by virtue of the special knowledge and influence on SOCOM's future requirements (gained from providing systems engineering and technical assistance under SWMS), would have an unfair advantage in the competition for those requirements."  AR 18664.  In addition, Jacobs argued that Raytheon Blackbird, as an equipment manufacturer, "would be evaluating itself and its many products and services, and its advice to the government could be undermined by its relationship to the product or service being evaluated."  Id.  Jacobs argued that the firewall Raytheon Blackbird proposed to create to mitigate OCI concerns would not be sufficient.  AR 18671.  Jacobs further argued that even if Raytheon Blackbird's OCI could be mitigated, the agency failed to consider the risk presented and thus improperly rated Raytheon Blackbird.  AR 18673.  According to Jacobs, even though Booz Allen, not Raytheon Blackbird, received task order one, Raytheon Blackbird's OCI issues were

---

[8] Jacobs and the other GAO protesters also argued that there were other reasons to set aside the awards.  However, as discussed above, the agency based its corrective action proposal on the GAO protesters' allegations regarding Raytheon Blackbird's OCI.

so great that Raytheon Blackbird should have been eliminated from the competition and should not have received an IDIQ award. AR 18662-63.

### D. Response to the GAO Protests and Proposed Corrective Action

In response to the GAO protest, the contracting officer wrote a memorandum for the record, dated September 2, 2015. AR 19002-04. In her memorandum, the contracting officer stated that after reviewing the allegation that the government failed to properly consider whether Raytheon Blackbird had actual or potential OCI with regard to task order one, the contracting officer realized that the agency had not performed a comprehensive OCI analysis for the three initially awardable task orders. AR 19002. The contracting officer explained that the solicitation "required offerors to discuss their plan for avoiding or mitigating OCIs on task orders, but because the focus was on orders to be competed after the initial award a separate OCI plan for initially awardable task orders was not required." AR 19003. According to the contracting officer, "the OCI assessment was limited to evaluating [each] offeror['s] plan (as described in their program management proposal) to avoid or mitigate OCIs and as previously identified, focused on the downstream competitions with the belief that OCI issues would be addressed during Task Order competitions." Id. The contracting officer went on to explain: "We unfortunately ignored the fact that we were conducting three Task Order competitions with the initial solicitation." Id.

The contracting officer continued:

> In our examination of the OCI issue we realized that [task order one] cuts across all of our Program Executive Offices (PEO). And because it requires the contractor to provide advice and assistance on numerous system platforms, it has the greatest potential for an impaired objectivity

OCI.  It is likely that Raytheon [Blackbird] is not the only of our offerors with an impact in this area.

Since [task order one] was one of the three Task Orders evaluated as part of the basic IDIQ award decision, any offeror with an unmitigateable OCI related to that Task Order would most likely be eliminated from the overall competition, even if that contractor would have no OCI problems for SWMS A Task Orders to be competed after award.

Id.

In addition, the contracting officer noted that the agency had identified "a significant change in the [task order one] requirement since release of the initial solicitation" and concluded that "the requirement as solicited no longer accurately reflects the current Government needs."  Id.[9]  The agency also identified changes in the requirements for task orders two and three that are "not as significant as those changes in the [task order one] requirement, [but] constitute a material change that renders the solicited requirements inaccurate."  Id.[10]

The CO based her decision to go back in the solicitation process and remove task order one from the solicitation on the following "findings":  First, "[e]valuation criteria for submitted OCI Plans were not included in the solicitation, and the OCI information identified in Section H.4 of the solicitation speaks only to future requirements and does not mention performance on the awardable task orders."  Id.  Second,

---

[9] Specific changes are not described in the memorandum, but the contracting officer stated that the agency had identified "56 changes to the original requirement, to include an increase of 16 FTEs."  AR 19003.  The record indicates that the agency identified these changes on August 3, 2015, before the agency awarded the task order.  AR 18514; Def.'s Reply 16.

[10] The government acknowledges that it would be able to handle these changes through in-scope contract and task order modifications and that these changes do not necessitate cancellation of the IDIQ and task order awards and recompetition.  Def.'s Mot. for J. on the Admin. R. ("MJAR") 39; Def.'s Reply 13.

As [task order one] contains OCI concerns that cannot be mitigated without severely restricting competition, a determination has been made to remove it from competition under SWMS Group A and compete it elsewhere with a more stringent OCI mitigation requirement.  With the removal of [task order one] from the solicitation, the remaining two requirements do not provide an adequate portrayal of the overall SWMS Group A requirement.  As such, a new requirement will need to be included in its place.

Id.[11]

The memorandum concludes "[b]ased on the above information" that the solicitation will be amended to:

> 1) Remove [task order one] from the requirement.
> 2) Add a new Task Order to ensure that the task orders evaluated are as a whole representative of the SWMS Group A scope[.]
> 2) Update the remaining Task Orders ([task order two] and [task order three]) to reflect changed requirements[.]
> 3) Establish a new date for submission of proposals[.]
> 4) Evaluate the submitted proposals[.]
> 5) Make a new award decision[.]

AR 19004.[12]

Thereafter, on September 3, 2015, the agency notified the GAO of the proposed corrective action.  AR 19005a.  Counsel for the agency explained in a letter to the GAO that:

> The agency has decided to take corrective action.  After reviewing the records relevant to the procurement the agency has determined that it did not properly evaluate the offerors' discussions of their [OCI] plans.

---

[11] The contracting officer also found that the agency had not included evaluation criteria with regard to offerors' compensation plans, "which reduces its usefulness in the award decision." AR 19003.  The contracting officer explained that while she "firmly believe[d] that the evaluation of Compensation Plans was thoroughly conducted and documented, the level of risk associated with the awardees may not have been completely defined."  Id.

[12] At oral argument, counsel for the government represented that task order one would be moved to the SWMS Group C procurement, pending a bid protest in connection with the Group C solicitation, or would be included under Group A with a waiver for unmitigatable OCI problems. Oral Arg. Tr. 17:12-18.

> The agency believes that the failure to perform a proper evaluation is
> inconsistent with the terms of the solicitation.  The agency has also
> determined that it must amend the solicitation to reflect changes in the
> requirements that have occurred.  The agency intends to establish a new
> date for submission of proposals, properly evaluate the proposals, and make
> new award decisions.  Since the new award decisions will be based on
> revised task order requirements, the agency will terminate the currently
> awarded contracts and task orders.  The agency will take any additional
> action deemed appropriate to maintain the propriety and integrity of the
> procurement.

AR 19005a.

On September 11, 2015, the GAO dismissed the protests as academic.  AR 19009-

10.

### E.    Challenge to the Proposed Corrective Action in this Court

On September 17, 2015, MacAulay-Brown filed its complaint in this court.

Jacobs intervened as a defendant, ECF No. 21, and Booz Allen and CACI intervened as

plaintiffs.  ECF Nos. 25 and 34.[13]  The agency voluntarily stayed performance of the

corrective action pending the outcome of this protest.  Def.'s Mot. for J. on the Admin. R.

("MJAR") 19.

On October 20, 2015, MacAulay-Brown, Booz Allen, and CACI each filed a

motion for judgment on the administrative record.  ECF Nos. 42-44.  On November 10,

2015, the government and Jacobs each filed a cross-motion for judgment on the

administrative record and response to the plaintiffs' motions.  ECF Nos. 51, 54.  On

November 17, 2015, the plaintiffs filed their replies and responses to the government's

---

[13] Booz Allen and CACI rely on MacAulay-Brown's complaint.

and Jacob's motions.  ECF Nos. 57-59.[14]  Finally, the government and Jacobs filed their

replies on November 24, 2015.  ECF Nos. 60-61.  Oral argument was held on

December 16, 2015.

## II.    JURISDICTION AND STANDING

Under the Tucker Act, 28 U.S.C. § 1491(b)(1), this court has "jurisdiction to

render judgment on an action by an interested party objecting to a solicitation by a

Federal agency for bids or proposals for a proposed contract or to a proposed award or

the award of a contract or any alleged violation of statute or regulation in connection with

a procurement or a proposed procurement."  The Tucker Act provides that this court

"shall have jurisdiction to entertain such an action without regard to whether suit is

instituted before or after the contract is awarded."  Id.  The United States Court of

Appeals for the Federal Circuit has held that this court's "bid protest jurisdiction arises

when an agency decides to take corrective action even when such action is not fully

implemented."  Sys. Application & Techs., Inc. v. United States, 691 F.3d 1374, 1381

(Fed. Cir. 2012) (citations omitted).

The plaintiffs in this case have standing as "interested parties" under the Tucker

Act because they are actual or prospective bidders and possess the requisite direct

economic interest.  See id. at 1382 (citing Weeks Marine, Inc. v. United States, 575 F.3d

---

[14] The plaintiffs also argue that if the court approves the planned corrective action, the agency should be required to provide the plaintiffs with source selection information, including technical ratings and price, comparable to the information that was released to the GAO protesters to ensure a level playing field.  The government disputes that this would be appropriate.  Because the court finds that the planned corrective action is not supported by the administrative record, it does not reach this issue.

1352, 1359 (Fed. Cir. 2009)).  In asserting the necessary injury for standing, the plaintiffs claim that the agency's planned corrective action will unreasonably require each of them to win the same award twice, and now with their prices made public.  The Federal Circuit has recognized that "[o]btaining a contract award, whether through sealed bidding or a negotiated process, is often a painstaking (and expensive) process." Id.  The Federal Circuit has therefore found that "[a]n arbitrary decision to take corrective action without adequate justification forces a winning contractor to participate in the process a second time and constitutes a competitive injury to that contractor." Id. (citation omitted). Moreover, where price is a crucial factor, the publication of an offeror's price can, in certain circumstances, create a non-trivial competitive injury. Id. at 1383.

## III.   LEGAL STANDARDS

In a bid protest case, the standard of review of an agency's action is governed by the Administrative Procedure Act, 5 U.S.C. § 706. See 28 U.S.C. § 1491(b)(4).  This standard is "highly deferential." Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir. 2000).  The court may not set aside an agency's action unless the action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Palladian Partners, Inc. v. United States, 783 F.3d 1243, 1252 (Fed. Cir. 2015) (quoting Savantage Fin. Servs. v. United States, 595 F.3d 1282, 1285 (Fed. Cir. 2010)).  In that connection, "[t]he court's task is to determine whether '(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'" Id. (quoting Savantage, 595 F.3d at 1285-86).  An agency's decision is "arbitrary and capricious when the agency 'entirely failed to consider an important aspect of the problem, offered an explanation for its

decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" Alabama Aircraft Indus., Inc.-Birmingham v. United States, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)).

In reviewing an agency's proposed corrective action, this court considers whether the corrective action is "reasonable under the circumstances." A-T Sols., Inc. v. United States, 122 Fed. Cl. 170, 185 (2015) (citing Sierra Nev. Corp. v. United States, 107 Fed. Cl. 735, 750 (2012); Sheridan Corp. v. United States, 95 Fed. Cl. 141, 151 (2010); ManTech Telecomms. & Info. Sys. Corp. v. United States, 49 Fed. Cl. 57, 65 (2001)). Finally, with regard to OCI, the Federal Circuit has made plain that a finding of "OCI must be based on 'hard facts; a mere inference or suspicion of an actual or apparent conflict is not enough.'" Turner Constr. Co. v. United States, 645 F.3d 1377, 1387 (Fed. Cir. 2011) (citing PAI Corp. v. United States, 614 F.3d 1347, 1352 (Fed. Cir. 2010)).

## IV.   DISCUSSION

### A.   The Decision to Take Corrective Action is Based on OCI Concerns that are not Supported by the Record.

The contracting officer's memorandum for the record states that after reviewing the GAO protesters' arguments and re-reviewing the proposals submitted in response to the solicitation, the agency realized that it had not sufficiently evaluated OCI issues with regard to task order one and "[i]t is likely that Raytheon [Blackbird] is not the only of our offerors with an impact in this area." AR 19003. The contracting officer goes on to state that because "any offeror with an [unmitigable] OCI related to [task order one] would

most likely be eliminated from the overall [SWMS Group A] competition, even if that contractor would have no OCI problems for SWMS A Task Orders to be competed after award," the agency has decided to remove task order one from SWMS Group A and terminate the awards.  Id.

The plaintiffs argue that the agency's decision to remove task order one from the SWMS Group A procurement and re-solicit offers is not supported by the record and must be set aside.  Relying on Turner Construction Co. v. United States, 645 F.3d at 1387, the plaintiffs argue in the first instance that there are no "hard facts" to support the conclusion that they have an OCI issue.  Nothing in the contracting officer's memorandum for the record or in other documents in the record identifies any facts to suggest an actual or potential OCI issue with the task order awardees or the other IDIQ awardees.  Without "hard facts" to suggest there is an OCI issue with regard to these awardees, they contend that corrective action is not necessary.  See MacAulay-Brown's MJAR 19-20; Booz Allen's MJAR 23; Booz Allen's Reply 13; CACI's Reply 11-13.

In addition, the plaintiffs argue that to the extent concerns about OCI issues with Raytheon Blackbird support taking some corrective action, the FAR requires the agency to first investigate the allegations of OCI and only if the agency determines that the OCI cannot be avoided or mitigated would corrective action be appropriate.  The plaintiffs also note that under section 9.503 of the FAR, an agency may waive any general rule or procedure for OCI concerns where the rule or procedure "would not be in the Government's best interest."  In addition, section 9.504(e) of the FAR requires a contracting officer to award a contract to an apparently successful offeror unless, after notifying the contractor, providing the reasons therefor, and allowing the contractor a

reasonable opportunity to respond, the contracting officer determines that a conflict of interest exists that cannot be avoided or mitigated.  The plaintiffs argue that FAR section 9.504(e) directs the agency to "re-engage the affected awardees and, where necessary, provide those awardees a reasonable opportunity to respond to concerns and/or address its mitigation plan."  MacAulay-Brown's MJAR 35 (citing C2c Sols., Inc., B 401106.6 et al., 2010 CPD ¶ 145 (Comp. Gen. June 21, 2010)); see also Booz Allen's MJAR 17-18 ("Following [FAR section 9.504(e)], the agency can analyze the potential OCI issues and raise those issues with the affected awardee without disrupting the procurement process and without terminating any of the awarded contracts . . . [and without] trigger[ing] the requirement to hold discussions with other offerors." (citing C2c Sols., Inc., B-401106.6 et al.; Cahaba Safeguard Administrators, LLC, B-401842.2, 2010 CPD ¶ 39 (Comp. Gen. Jan. 25, 2010))).  Therefore, the plaintiffs contend the agency is not compelled to take the planned corrective action even if the contracting officer's OCI "finding" is supported by the record.  The plaintiffs further note that the solicitation has a waiver provision for an awardee to avoid submitting a proposal for a task order if the task order would present an OCI problem.  See AR 874.  They suggest that this provision could also be invoked to address any OCI issues.  See MacAulay-Brown's MJAR 8; MacAulay-Brown's Reply 7-8.[15]

---

[15] MacAulay-Brown notes that "the waiver process in the RFP, which relieves a contractor from having to bid on future task orders if an OCI exists, is different than the [FAR section 9.504(e)] waiver process, which allows a contracting officer to award a contract notwithstanding the presence of an OCI."  MacAulay-Brown's Reply 7 n.8.

Finally, the plaintiffs argue that the administrative record does not support the contracting officer's contention that the OCI plans submitted did not address task order one or that the OCI plans were not evaluated.  The plaintiffs argue that each of the IDIQ awardees discussed their OCI concerns, including concerns about the three initially awardable task orders, and the agency found their plans acceptable.  MacAulay-Brown's MJAR 26; Booz Allen's MJAR 4-5; CACI's MJAR 15.  They note that both Raytheon Blackbird and Booz Allen specifically identified how any actual or potential OCI issues with task order one would be addressed.  See also AR 16196-200 (Raytheon Blackbird's OCI plan), 13178-84 (Booz Allen's OCI plan).

In response, the government argues that the agency's decision to take corrective action before evaluating whether any of the awardees or other offerors have unmitigatable actual or potential OCI for task order one is supported by the record.  Def.'s MJAR 22.  The government contends that the entire procurement process was "tainted" by the risk of unmitigatable actual or potential OCI under task order one.  Def.'s MJAR 32.  Specifically, the government argues that because of the potential OCI issues raised before the GAO with regard to Raytheon Blackbird, the agency acted within its discretion when it decided that task order one should be removed from Group A and that it needed to re-solicit offers.  Def.'s MJAR 22-23.  According to the government, evaluating the extent of any OCI problem under FAR section 9.504(e), assuming it applies to actual awardees, is not sufficient because the agency has already concluded that task order one contains OCI concerns that cannot be mitigated without severely

restricting competition.  See Def.'s MJAR 51 n.6.  As such, the government concludes, the procurement must be redone.  See Def.'s MJAR 28 n.2; Def.'s Reply 20 n.15.[16]

The court finds on this record that the agency's proposed corrective action goes too far and thus must be set aside.  First, the court agrees with the plaintiffs that the record does not show that the agency failed to consider OCI in connection with awarding task order one.  The record reflects that each of the awardees, including Raytheon Blackbird, addressed OCI with regard to the procurement, including task order one, and noted concerns in their proposals.  AR 13178-84 (Booz Allen), 13635-37 (CACI), 15912-16 (MacAulay-Brown), 16196-16200 (Raytheon Blackbird).  Each of the awardees received an acceptable rating on their OCI plans.  See individual technical evaluations for MacAulay-Brown, AR 17221, 17226, 17232, 17238; Booz Allen, AR 17063, 17068, 17074, 17079; CACI, AR 17087, 17092, 17098, 17103; Raytheon Blackbird, AR 17244, 17249, 17255, 17260.  There is nothing in the record to suggest that the OCI plans were not reviewed for task order one.  The RFP may have been focused on OCI plans for future task orders, but a review of the proposals themselves reveals that the offerors addressed OCI concerns for task order one and that the agency reviewed the awardees' OCI plans.

---

[16] The government also argues that "the agency need not have 'hard facts' for its corrective action to be 'reasonable' because 'the mere appearance of a conflict is enough to preclude award' and 'that prejudice is presumed where proprietary information is available to an offeror.' Def.'s MJAR 28 n.2 (citing NetStar-1 Gov't Consulting, Inc. v. United States, 98 Fed. Cl. 729, 734 (2011).  However, the court in NetStar-1 found expressly that there were hard facts to support a finding of OCI in that case.  See 98 Fed. Cl. at 732.  In the portion of the opinion quoted by the government, the court in NetStar-1 recognized that declarations from a winning bidder, averring that it did not take advantage of unequal access to information, did not foreclose a finding of prejudice to the other bidders.  Id. at 734.

Second, there is no support in the record for the contracting officer's finding that OCI cannot be mitigated without severely restricting competition.  The finding does not identify any supporting evidence in the record.  Indeed, the government concedes that "[t]he agency has not yet done the analysis . . . to determine whether hard facts support findings of OCI," Def's Reply 20 n.15, and that "we haven't found anybody has OCI." Oral Arg. Tr. 70:25, 72:20; see also Def's MJAR 28 n.2 ("The agency did not delineate 'hard facts' in its corrective action memorandum specifying why it identified significant OCI concerns for Raytheon in particular.").  More importantly, the contracting officer's finding is contradicted by the record, which demonstrates that the agency early in the procurement process considered whether including task order one in Group A was appropriate and concluded that it was.  As discussed above, the agency went through a process prior to issuing the RFP to address OCI concerns.  See AR 27.  Eventually, the agency decided to establish three separate procurements in large part to address the risk of OCI.  These became Groups A, B, and C.  See AR 30.  The record also shows that the potential issue of OCI with regard to certain tasks in Group A was brought to the agency's attention and the agency rejected the concern.  Specifically, the agency received comments suggesting that the agency move certain Group A tasks to Group C, the group created for task orders with significant potential for OCI.  The record reflects that the agency rejected the suggestions.  For example, one commenter noted that the statement of work for Group A "contains tasks that qualify as Advisory and Assistance Services (Strategic and Operational Planning, Acquisition Support and Test & Evaluation to name a few)" and, "[a]s a result, [IDIQ awardees] may need to recuse themselves from participating on Tasks due to potential OCI concerns."  AR 331.  The commenter asked

"[a]s this limits competition, would the Government consider moving all (A&AS) tasking to another Group C?" Id. The government responded with a simple "No." AR 331. In response to other comments raising OCI concerns regarding the draft task orders, the government responded that "[i]f there is a high risk of a potential or actual OCI, the task order will be awarded under Group C. Otherwise the mitigation will occur at the task order level for Groups A & B." E.g., AR 331. Having gone through this process to create three groups and consider appropriate tasks for each, the government, without more facts and analysis, is not free to change course and terminate the awards.

In view of the foregoing, the court agrees with the plaintiffs that this case presents facts closer to WHR Group, Inc. v. United States, 115 Fed. Cl. 386, 398 (2014), in which the court set aside a corrective action decision for going too far "under the circumstances," than to Sierra Nevada Corp. v. United States, 107 Fed. Cl. 735 (2012), which the government relies on to suggest that an agency is free to resolicit a procurement anytime there is a problem with the solicitation or its evaluation of offers. In WHR Group, an agency asserted that it was reasonable to cancel four blanket purchase agreements ("BPAs") and re-solicit proposals in order to: (1) resolve a GAO protest in connection with one of the four BPAs, (2) remove an "outdated" financial capability requirement from the solicitation, (3) address evaluation errors regarding that requirement, (4) address a potential conflict with the FAR, and (5) align the solicitation with revised projected requirements. Id. at 398. The WHR Group court found that the proposed corrective action was not reasonable under the circumstances for four primary reasons. First, the court found that "[b]ecause the [GAO] protest plainly did not implicate the first three awards, . . . it cannot provide a rational basis for the [agency's]

decision to terminate those awards." Id. at 398. Second, the court found no evidence in the record to support the agency's "bald assertions in notes to the file" that removing the financial capability requirement was necessary; the record did not include any analysis or findings regarding the impact of that decision or an explanation of the agency's reasons for removing the requirement. Id. at 398-99. Third, the court determined that the agency's failure to review offerors' supporting documents meant that corrective action should be limited to further review and not wholesale re-solicitation. See id. at 399-400. Finally, the WHR Group court rejected the government's contention that a changed estimate of the agency's needs provided a rational basis for re-solicitation because the estimate was provided only to assist offerors with pricing. See id. at 401-02. This case presents similar concerns regarding a lack of support for the government's findings and the need for corrective action. Here, as in WHR Group, the agency has not identified evidence in the record or conducted an analysis to support its conclusion that re-solicitation is required to ensure that procurement issues are addressed and thus reasonable under the circumstances.

The court finds that the government's reliance on Sierra Nevada to support its contention that changing the terms and re-soliciting the procurement is misplaced. In Sierra Nevada, an agency proposed to cancel an award and resolicit a procurement as corrective action after it conducted an investigation which revealed a tainted procurement process. Id. at 754. Because the agency "reasonably considered that the entire process was tainted by bias," based on evidence gathered in initial investigative efforts, the court concluded that "corrective action to amend the solicitation and to request new proposals was a reasonable solution in the circumstances." Id. at 754-55. In this case, as discussed

above, the agency has not conducted the fact-finding and analysis necessary to support its position that, despite looking at the issue previously, including task order one in Group A raises OCI concerns that are not mitigatable.  Indeed, to the contrary, the agency conducted a pre-solicitation review in which it concluded there would not be an OCI issue with including task order one in Group A.

In sum, while the court agrees that the agency has the discretion to consider whether OCI issues that were raised before the GAO require corrective action, the agency's proposed corrective action is not supported by the record and is thus not reasonable under the circumstances.

### B.     The Other Grounds Presented do not Support the Proposed Corrective Action.

The plaintiffs argue and the court agrees that none of the other grounds the government provides for the corrective action, alone or together, support the planned cancellation of awards and re-solicitation.  The government asserts that the agency's desire to make changes to the three initial task orders "supports" its corrective action proposal and notes that the planned corrective action gives the agency an opportunity to make other changes to the solicitation based on the GAO protests.  Def.'s MJAR 39, 43. In particular, the government highlights the contracting officer's statement, in her memorandum for the record, that the agency had identified "a significant change in the [task order one] requirement since release of the initial solicitation" and concluded that "the requirement as solicited no longer accurately reflects the current Government needs."  AR 19003.  The agency also identified changes in the requirements for task orders two and three that are "not as significant as those changes in the [task order one]

requirement, [but] constitute a material change that renders the solicited requirements inaccurate." Id.  Lastly, the agency would take this opportunity to add evaluation criteria for compensation plans.  Def.'s MJAR 43-47.

However, the agency had already identified and planned to make the changes to task order one before the agency awarded the task order.  AR 18514; Def.'s Reply 16.  In addition, the government acknowledges that it would be able to make the planned changes to each of the task orders through in-scope modifications and that these changes do not require the agency to cancel the IDIQ and task order awards and resolicit offers.  Def.'s MJAR 39; Def.'s Reply 13.  Finally, the government recognizes that including evaluation criteria for compensation plans "was not the impetus for the corrective action and that the agency was "not concerned" with this ground.  Def.'s MJAR 45.  The contracting officer explained in her memorandum for the record that she "firmly believe[d] that the evaluation of Compensation Plans was thoroughly conducted and documented . . . ."  AR 19003.  Therefore, these grounds cannot provide a rational basis for cancelling the IDIQ and task order awards and resoliciting the procurement.

## C.   Injunctive Relief is Warranted.

This court "may award any relief that the court considers proper, including declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs."  28 U.S.C. § 1491(b)(2).  In deciding whether to grant permanent injunctive relief, a court considers whether:  "(1) the plaintiff has succeeded on the merits, (2) the plaintiff will suffer irreparable harm if the court withholds injunctive relief, (3) the balance of hardships to the respective parties favors the grant of injunctive relief, and (4) the public interest is served by a grant of injunctive relief."

29

Centech Grp., Inc. v. United States, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (citing PGBA,

LLC v. United States, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004)).  In this case, the

plaintiffs have succeeded on the merits.  Therefore, the court must consider whether they

will suffer irreparable harm if the court withholds injunctive relief, whether the balance

of hardships to the respective parties favors the grant of injunctive relief, and whether the

public interest is served by a grant of injunctive relief.  See id.

    The government asserts that the plaintiffs cannot show irreparable harm "where

the agency believes the contracts were improperly awarded."  Def.'s Reply 24; see also

Def.'s MJAR 52 ("Plaintiffs' argument [that they will suffer irreparable harm because

they will have to compete for an award that they have already won] ignores the fact that

[they] improperly received that award because the procurement process was flawed.").

However, "[w]hen assessing irreparable injury, '[t]he relevant inquiry . . . is whether

plaintiff has an adequate remedy in the absence of an injunction.'"  PGBA, LLC v.

United States, 57 Fed. Cl. 655, 664 (2003) (quoting Magellan Corp. v. United States,

27 Fed. Cl. 446, 447 (1993)).  The government does not suggest alternative remedies for

the plaintiffs and courts have found that the "loss of potential work and profits from a

government contract constitutes irreparable harm."  Springfield Parcel C, LLC v. United

States, 124 Fed. Cl. 163, 194 (2015) (citations omitted).  Here, MacAulay-Brown and

Booz Allen would lose their current task order awards and each of the plaintiffs would

lose the opportunity to compete for future task orders.  This court has found irreparable

injury in similar circumstances.  See KWR Constr., Inc. v. United States, 124 Fed. Cl.

345, 362-63 (2015); Caddell Constr. Co. v. United States, 111 Fed. Cl. 49, 115-16

(2013); CW Gov't Travel, Inc. v. United States, 110 Fed. Cl. 462, 495 (2013).

The balance of hardships to the respective parties also favors the grant of injunctive relief. The government emphasizes the agency's need to take corrective action to address OCI concerns. Def.'s MJAR 54-55. Yet, injunctive relief setting aside the planned corrective action does not prevent the agency from taking corrective action to resolve these issues once the agency has undertaken a proper evaluation. The agency could, for example, gather more information from government sources and from the awardees consistent with FAR section 9.504(e), conduct an evaluation to determine if its OCI concerns are well-founded, and then take corrective action.

Finally, the court finds that the public interest is served by a grant of injunctive relief setting aside the proposed corrective action. Courts have held that "maintenance of the integrity of the procurement process weighs heavily in favor of granting a permanent injunction." See, e.g., Springfield Parcel C, 124 Fed. Cl. at 195. Here, the government's decision to terminate awards without adequate record support is not in the public interest. The court finds that the public interest favors injunctive relief that maintains the status quo until the agency evaluates whether the OCI issues alleged in the GAO protests require any change to the current awards. See, e.g., Turner Constr., 645 F.3d at 1388 ("Injunctive relief is appropriate if it 'enjoin[s] the illegal action and return[s] the contract award process to the status quo ante.'" (citing Parcel 49C Ltd. P'ship v. United States, 31 F.3d 1147, 1153 (Fed. Cir. 1994))). Accordingly, the court finds that the public interest weighs in favor of injunctive relief.

## V.    CONCLUSION

For the reasons discussed above, the court concludes that the agency's proposed corrective action is not reasonable under the circumstances. There is no evidence in the

record of any actual or potential OCI to support the agency's plan to cancel the plaintiffs'

IDIQ awards and resolicit the procurement.   Accordingly, the plaintiffs' motions for

judgment on the administrative record are **GRANTED**.   The government's and Jacob's

cross-motions for judgment on the administrative record are **DENIED**.   The agency's

decision is **VACATED**.   Pursuant to Rule 52.2 of the Rules of the Court of Federal

Claims, the matter is **REMANDED** to the agency until **May 10, 2016**, to allow the

agency consider whether OCI concerns require corrective or other action.   The

government shall submit a status report at or before the conclusion of the remand period

on the status of the remand proceedings.

  **IT IS SO ORDERED.**

s/Nancy B. Firestone   
NANCY B. FIRESTONE
Senior Judge
